IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

NORVELL BUFFORD,

         Plaintiff,

        vs.                         Case No. 04-1334-JTM

BOEING COMMERCIAL AIRPLANE
GROUP – WICHITA DIVISION, a Delaware
Corporation,

        Defendant.

## MEMORANDUM AND ORDER

This matter comes before the court on the defendant's Motion for Summary Judgment (Dkt. No. 48). Defendant argues that Boeing had a legitimate, nondiscriminatory reason for demoting plaintiff from management and thus this reason was not a pretext for race discrimination.  Plaintiff responds that he has direct evidence of discrimination and has come forward with evidence of pretext.  After reviewing the parties' arguments, the court finds in favor of defendant.

## I. STANDARD OF REVIEW

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgments as a matter of law.  Fed.R.Civ.P. 56(c).  In considering a motion for summary judgment, the court must examine all of the evidence in a light most favorable to the opposing party.  Jurasek v. Utah

State Hosp., 158 F.3d 506, 510 (10th Cir. 1998).   The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt.   Baker v. Board of Regents, 991 F.2d 628, 630 (10th Cir. 1993).   The moving party need not disprove the nonmoving party's claim or defense; it need only establish that the factual allegations have no legal significance.   Dayton Hudson Corp. v. Macerich Real Estate Co., 812 F.2d 1319, 1323 (10th Cir. 1987).

The party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts.   "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis in Matsushita).   The opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the opposing party must present significant admissible probative evidence supporting that party's allegations.   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

## II. FINDINGS OF FACT

**Plaintiff's Work History at Boeing**

Norvell Bufford is an African American male who began his employment at Boeing in 1980 as a factory service attendant, a maintenance utility person that includes janitorial, light labor-type work.  He remained in this position until April 1985, when he was promoted to a first-level manager position in Facilities.

In January 2004, plaintiff became the first-level manager of Zones 1 and 2 in the Transportation Department of Workforce Services.  As such, he was responsible for crews of individuals that transport parts throughout the facility.  Plaintiff's supervisor was Harold

2

Peterson, a second-level manager who was senior manager of transportation.  Jim Urso was the director of the Shared Services Group.  As such, he was Peterson's manager.  Gina Boswell was the human resources representative who supported Urso's organization.

Bufford received his last performance review in December 2003, approximately one month before the "restroom incident," which is discussed in detail below.  It reflected Bufford had been meeting or exceeding all expectations and was an "excellent performer."

**Plaintiff's Previous Discipline**

Over the course of his career in management, plaintiff was formally and informally disciplined numerous times when Boeing believed he had exercised poor judgment.  The most notorious of these prior incidents was his role in a 1996 strip search of Clara Baker, a subordinate of plaintiff's, which resulted in a lawsuit by Baker against Boeing and plaintiff individually. Boeing security conducted the strip search.  Although the parties did not elaborate on Bufford's role in the incident (beyond noting that Bufford was not personally involved in the search), Boeing issued Bufford a Corrective Action Memorandum ("CAM") for exercising poor management judgment. Plaintiff was also disciplined in the late 1990s when Boeing believed that he had unilaterally implemented a 10-hours-a-day, four-days-a-week work schedule for his crew, without obtaining approval, in violation of the collective bargaining agreement between Boeing and the Machinists Union, which resulted in a grievance against Boeing.

**The January 31, 2004, "Restroom Incident"**

On January 31, 2004, Kimberly Moroney, a female employee security guard, filed an official Boeing security report concerning an incident that occurred that day when she entered the women's restroom in plaintiff's building while she was conducting a security check.

3

Moroney reported that when she turned into the last stall, she saw plaintiff standing there with his pants down and his genitalia fully exposed. Moroney stated that plaintiff bent down to pull up his pants, and she exited the restroom.  According to Moroney, plaintiff came out of the restroom and said he was confused and thought he had gone into the men's restroom.  Moroney reported that she had been in the restroom for at least a minute before entering the stall, the door of which was wide open, and that plaintiff never announced his presence.

Following Moroney's report, James Whittredge, an investigator in the security department, conducted a formal investigation. On February 3, 2004, Whittredge took statements from both Moroney and plaintiff.  Whittredge prepared a formal investigation report after completing his investigation. The investigation report stated that plaintiff changed parts of his story a couple of times during the interview process.  Whittredge related the following in his report:

> When interviewed on February 3, 2004, plaintiff originally stated that he had been in his office in building 2-250G and went into the restroom, but later stated that he had been in Plant II on a scooter and came back to the 2-250G building to use the restroom. Plaintiff walked into the restroom and went into a stall. He was using the facilities when he noticed a Kotex box next to the toilet. He had noticed a vase with a flower on the counter, and realized that it was the women's restroom. Plaintiff heard someone come into the restroom. Plaintiff first stated that there was no conversation between himself and the officer, but later changed his story to say that he said "excuse me." Plaintiff saw in the mirror that it was a female. Plaintiff pulled up his pants and opened the stall door. The officer turned around and walked out. Plaintiff walked out of the restroom, and told the officer that he did not realize it was the women's restroom. [Dkt. No. 49, Ex. 28, Whittredge Decl. ¶ 4; Ex. 1, Pl. Dep. 137-38; Ex. 15, Dep. Ex. 37; Ex. 19, Dep. Ex. 66.]

> When interviewed on February 4, 2004, plaintiff related that he came to the 2-250G building on a scooter. He walked into the restroom and entered a stall. He realized he was in the women's restroom when he saw a box of Kotex on the floor. Plaintiff heard someone come in and he said "excuse me." The person responded "okay". Plaintiff opened the stall and saw the person leaving the restroom. Outside the restroom, plaintiff said he had made a mistake. He then

claimed there was no conversation about why he was in the restroom.

Dkt. No. 49, Ex. 28, Whittredge Decl. ¶ 4; Ex. 19, Dep. Ex. 66.  Whittredge directed his report to Urso, as director of the organization.  Peterson, as plaintiff's manager, and Boswell, in human resources, also received copies.

Peterson, Urso, and Boswell had numerous discussions concerning the investigation report and what discipline should be taken against plaintiff.  They discussed both the actual incident of plaintiff being in the women's restroom and the changes in plaintiff's story throughout the investigation to determine whether corrective action should be taken for "what we felt was less than truthfulness in his statements."  Dkt. No. 49, Ex. 2, Boswell Dep. 27-28; Ex. 5, Urso Dep. 56-57.  Peterson, Urso, and Boswell all felt that plaintiff was less than truthful in the security report, and they were concerned that the incident and plaintiff's changing statements would impact his leadership ability.

Urso seriously believed that plaintiff should be removed from management.  Urso, however, relied on Peterson, as the second-level supervisor, to tell him what Peterson thought was the appropriate action.  Peterson concluded that plaintiff's decision to enter the women's restroom was an error in judgment, but believed that plaintiff had made a mistake. Peterson recommended that plaintiff be disciplined but not removed from management.  Urso approved Peterson's recommendation.

On February 18, 2004, Peterson issued plaintiff a CAM and Last Chance Memorandum, suspended him without pay for 10 days, reduced his retention rating from B to C, and made him ineligible for a salary adjustment in 2004 for not complying with the Expected Conduct

Standards.  The failure to comply with the Expected Conduct Standards applied to both

plaintiff's being in the restroom and his being untruthful in his statement regarding the incident.

Boeing has a policy that matters in investigations, like the restroom incident, are to be

kept confidential.  Kim Moroney testified she did not tell anyone outside the investigation of the

restroom incident; however, as Moroney testified, she was approached by a number of employees

about whether she was the woman involved in the incident.  Gina Boswell testified she "had

heard numerous rumors that had gone through the facility" on the subject.  Several of Bufford's

subordinates and co-workers reported to him the rumors they were hearing about the incident

itself and also about the possible discipline against Bufford.  After Bufford returned from the

suspension, the rumors continued. Bufford testified that he saw and removed signs complaining

that Bufford and Peterson did not have to comply with Boeing's code of conduct because of their

race.

**The February 2004 "Radio Incident"**

Plaintiff managed a crew of forklift drivers who used radios to communicate.  It is

important that the radios remain open to allow official business and to avoid distracting drivers.

Boeing has guidelines for radio use that are given to each manager and transportation drive.

Transportation managers such as plaintiff were told to use the handbook as a training guide, and

plaintiff was familiar with these guidelines.  The guidelines note that inappropriate use of the

radios exposes Boeing to substantial fines from the Federal Communications Commission

("FCC").

### Problems with Improper Radio Use

The issue of improper radio use in the transportation department had been building for

some time in late 2003 and early 2004. James Urso testified that improper radio use had been the subject of certain e-mails and memos in 2001 and 2003 to various members of management.

Mary Daniel was a first-level manager over Dispatch and Transportation.  Daniel listened to radio traffic as part of her job.  On January 26, 2004, Daniel sent plaintiff an e-mail, copying Peterson, asking him to clean up the unnecessary and unprofessional radio talk in his zone.  The e-mail was prompted by the employees talking about Phil Condit (Boeing's former CEO) on the radio.

On February 7, 2004, Daniel sent Peterson an e-mail again reporting inappropriate radio use in the transportation area, this time attaching recordings of inappropriate radio use and referencing the radio use policy.  For example, employees were having extended conversations, discussing such things as the mating habits of cicadas, putting a well in on someone's property, and whether Harry Stonecipher (another former CEO) had signed the Boeing code of conduct.

After Daniel's e-mail, Peterson discussed this issue of inappropriate radio use with his first-level managers, including plaintiff, at a staff meeting.  Peterson told the managers to talk to their crews and get them to use the radio right.

When Bufford began his ten-day suspension, it was understood that there was further work to do with his crew on the radio issue. This fact was reflected in the "Last Chance Memorandum" that was made a part of the February 19, 2004 CAM. That CAM was based primarily on the restroom incident, but also made reference to the radio issue. It specifically noted a number of items that Bufford should focus on in the future, including "effectively address unnecessary radio traffic by crew." Dkt. No. 49, Ex. 14, Dep. Ex. 34.   Before he began the suspension, Bufford gave Mr. Peterson a written list of things that needed to be done while

Bufford was to be gone. The list included as an item for Thursday "Radio Conduct (Handout) on my desk."  Dkt. No. 49, Ex. 14, Dep. Ex. 34.

**Peterson's Investigation Concerning Radio Use**

While plaintiff was on suspension from the women's restroom incident, members of his crew continued to engage in inappropriate radio conversations.  In the process of disciplining the employees, the employees indicated to Peterson that they had never been trained or talked to about the radio policy.  Specifically, Timothy Thomas, one of the employees plaintiff supervised, told Peterson that plaintiff had not instructed the crew on permissible versus impermissible radio conversations.  Thomas filed a complaint about receiving a CAM, claiming it was unfair; the CAM was eventually withdrawn because Peterson concluded that plaintiff had not provided instructions on proper radio use.

Peterson called plaintiff at home to ask about what training he had given his crew. Plaintiff said that he had conducted the training on radio use.

Peterson interviewed about five of plaintiff's crew members, one of whom, Rosemary Moss (who is African American), Peterson believed to be particularly impartial and credible. Some of the crew members told Peterson that plaintiff had not discussed the radio use guidelines. Moss told Peterson that plaintiff had a staff meeting, but there was no training on radio use. Moss recounted that plaintiff played less than three seconds of the recordings and said, "You know what to do. I'm not going to take up the time to do this."

Plaintiff returned to work from his suspension on March 5, 2004.  That day, plaintiff sent Peterson an e-mail stating again that he had discussed radio use at his crew meeting in early February and told the employees to not make inappropriate or personal comments on the radio.

The investigation by Gina Boswell into Bufford's training efforts on radio use revealed that Mr. Bufford had indeed spoken with his crew about the radio rules on February 12, 2004.   Plaintiff reported to Peterson that he played one or two of the recordings that Daniel sent.

Plaintiff took a medical leave of absence from March 9, 2004, to March 17, 2004.

After his investigation, Peterson concluded that plaintiff had not provided appropriate direction to his crew about proper radio use.  Although Peterson testified in his deposition that Bufford is an honest person and of good character, Peterson also concluded that plaintiff had been "less than factual" with him in explaining what training measures plaintiff had taken.

Peterson, Urso, and Boswell considered the appropriate discipline for plaintiff.  Peterson recommended that they demote plaintiff from management and move him into a new position.  Peterson's recommendation resulted from his concerns bout plaintiff's credibility.  Plaintiff claimed had done the necessary training with his crew, when, in fact, it appeared he had failed to do so.  This led Peterson to question whether plaintiff could lead the group as a manager, and Peterson ultimately concluded plaintiff could not.

**Plaintiff's Demotion from Management**

On March 22, 2004, after plaintiff returned from medical leave, Peterson issued him another CAM and demoted him to a non-management salaried position for not complying with the Expected Conduct Standards.  Specifically, Peterson believed that plaintiff had not followed his instructions to properly instruct his crew on the radio use policy, and that plaintiff was not honest about it when Peterson questioned him.

No other manager has ever been demoted for improper instructions to his crew about radio usage.  Gina Boswell could not recall any employee ever receiving a CAM for casual radio

use.  When Gina Boswell interviewed Bufford on March 17, 2004, he explained that he played only part of the radio recordings because some of his crew would be able to identify the voices and would be embarrassed and feel singled out.  Gina Boswell testified that trying to avoid such embarrassment was a reasonable thing for Bufford to do as a manager.  Bufford also told Boswell that he informed his crew to avoid inappropriate radio traffic.

When a Boeing manager is demoted, whether because of discipline or pursuant to a reduction in force, it is common to move the person back to the last non-management position the person held.  Peterson, however, did not want to reduce plaintiff back to the non-management position he held years ago (a low level janitorial job) because it would have meant a significant salary cut.  Peterson worked with Boswell to find plaintiff a position with a higher salary.

The salaried position to which plaintiff was demoted paid $79,600 a year, about $3,000 less per year than his manager position, which paid $82,950 a year.  On March 19, 2004, plaintiff was demoted from management and reclassified to a salaried, non-management position.

On the day Bufford received the CAM about the radio issue and was demoted, Harold Peterson met privately with Bufford in advance to discuss and explain what was going to happen. Peterson explained that his superiors, including Jim Urso, felt he had been too lenient on Bufford with respect to the restroom incident.  Peterson stated that his supervisors believed Jim Urso was a "chicken shit" for not firing Bufford when he had a chance to do it.

**Plaintiff's Administrative Charge and This Lawsuit**

On May 25, 2004, plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC"), alleging he was treated unfairly by being demoted to a salaried position because of either his race or his age.  The EEOC was unable to conclude that a violation had

occurred, and issued plaintiff a Dismissal and Notice of Rights on July 29, 2004.

Plaintiff then filed this lawsuit on October 21, 2004, alleging that Boeing discriminated against him on the basis of his race and age when it suspended him for the restroom incident and demoted him for the radio incident. In the pretrial order, plaintiff abandoned any claim for his suspension and also abandoned his age discrimination claim.

**Plaintiff's Termination**

On June 16, 2005, about fifteen months after he was demoted, plaintiff, along with thousands of other Boeing employees, was terminated pursuant to Boeing's sale of the assets of its commercial facility in Wichita.

**III. ANALYSIS**

Plaintiff's remaining claim in this suit relates to allegations of demotion from management based on his race in violation of Title VII. Plaintiff alleges both direct and circumstantial evidence of his claim. In construing the findings in favor of the nonmoving party, the court determines there is no direct or circumstantial evidence of racial discrimination. Defendant had a nondiscriminatory basis for termination.

"A plaintiff alleging discrimination on the basis of race may prove intentional discrimination through either direct evidence of discrimination ... or indirect (i.e., circumstantial) evidence of discrimination." Kendrick v. Penske Transp. Services, Inc., 220 F.3d 1220, 1225 (10th Cir. 2000). In cases of circumstantial evidence of discriminatory intent under Title VII, the court applies the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Pursuant to the McDonnell Douglas framework, the employee "must carry the initial burden ... of establishing a prima facie case of

11

racial discrimination." <u>Kendrick v. Penske Transp. Servs., Inc.</u>, 220 F.3d 1220, 1226 (10th Cir.

2000) (quotation marks and citation omitted).  Typically, to establish a Title VII racial

discrimination claim under <u>McDonnell Douglas</u>, a plaintiff must demonstrate: 1) that he belongs

to a racial minority; 2) that he applied and was qualified for a job for which the employer was

seeking applicants; 3) that, despite his qualifications, he was rejected; and 4) that, after his

rejection, the position remained open and the employer continued to seek applicants from

persons of complainant's qualifications. <u>McDonnell Douglas</u>, 411 U.S. at 802, 93 S.Ct. 1817.

 Once the employee establishes a prima facie case, "the burden then must shift to the

employer to articulate some legitimate, nondiscriminatory reason for its employment action." <u>Id.</u>

(quotation marks and citation omitted).  "The relevant inquiry is not whether [the employer's]

proffered reasons were wise, fair or correct, but whether [the employer] honestly believed those

reasons and acted in good faith upon those beliefs." <u>Bullington v. United Air Lines, Inc.</u>, 186

F.3d 1301, 1318 (10th Cir.1999).  If the employer satisfies its burden of production, the

employee must then show that the employer's justification is pretextual--i.e., unworthy of belief.

<u>See Kendrick</u>, 220 F.3d at 1226, 1230.  "[A] plaintiff's prima facie case, combined with sufficient

evidence to find that the employer's asserted justification is false, may permit the trier of fact to

conclude that the employer unlawfully discriminated." <u>Reeves v. Sanderson Plumbing Prods.,</u>

<u>Inc.</u>, 530 U.S. 133, 148, 120 S.Ct. 2097, 2109, 147 L.Ed.2d 105 (2000).

 For the purposes of this motion, defendant assumes that plaintiff can establish a prima

facie case of discrimination.  The court reviews the case under the standard established in

<u>McDonnell Douglas</u>.  Bufford falls within a protected class as a racial minority.  He was

qualified for his position when he was hired and received a review from Peterson in December

12

2003 stating he was an "excellent performer." He alleges he was demoted because Peterson was lenient in disciplining him for the restroom incident because both were African Americans. Evidence of whether his managerial position is currently open is not available but is less relevant because this is an instance of demotion.  Based on these facts, there appears to be evidence of a prima facie case of race discrimination.

Thus, the court proceeds to the second step of the analysis where the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the allegedly discriminatory action.  Boeing asserts that Bufford's improper radio training and his less than factual explanation of his training measures provide adequate bases for demotion. Although Peterson acknowledged that Bufford was an honest man and of good character, he questioned plaintiff's ability to train and lead his crew.  In light of prior incidents and the incomplete radio training, Boeing could reasonably conclude that it was inappropriate to maintain Bufford in his supervisory role.  Boeing provided a legitimate nondiscriminatory basis for plaintiff's demotion.

The court proceeds to the third step of the analysis where plaintiff must show that the employer's justification is pretextual.  Plaintiff responds to this step of the analysis in two ways: 1) that there is direct evidence of discrimination, which renders the McDonnell Douglas burden-shifting standard inappropriate in this case; and 2) that there is circumstantial evidence sufficient to overcome Boeing's justification.  Plaintiff offers direct evidence of discrimination based on a conversation between Bufford and Peterson where Peterson allegedly indicated that race was a factor.  There are several problems with this evidence.  First, there are several levels of hearsay. The conversation Peterson communicated was a conversation his superior, Jim Urso, indicated he had with another manager. The reliability of the information is obviously in doubt.  Second, even

if the court were to assume that the statements were accurate, plaintiff's characterization appears to misconstrue the conversation.  In plaintiff's deposition, he indicated that his superiors had wanted to fire him because of the search related to Clara Baker and the bathroom incident. Plaintiff assumes that the demotion was because Peterson had been lenient with Bufford because they were both African American.  There is no direct evidence that race was the basis or motivation for Bufford's demotion. It is merely Bufford's theory that race was the basis for his demotion.  See Steele v. Hill's Pet Prods., Inc., No. 87-1341, 1989 U.S. Dist. LEXIS 11625, at *10 (D. Kan. Sept. 12, 1989) (citing Lucas v. Dover Corp., 857 F.2d 1397, 1400 (10th Cir. 1988)) (noting that "[d]irect evidence is not plaintiff's own stated belief that discrimination was the only reason for the adverse action.").

Plaintiff next presents evidence to overcome the employer's stated nondiscriminatory reason for its action. Again, plaintiff presents evidence from his conversation with Peterson. The court finds, as before, that this evidence is inconclusive as to whether race was a motivating factor.  Plaintiff's own testimony appears to indicate that it was the nature of the bathroom incident and the search of Clara Baker that motivated the demotion, rather than his race. There was nothing in the conversation with Peterson that indicated that the bathroom incident had been sensationalized because plaintiff is African American.  Based on the record, the final incident with the radio training made clear to plaintiff's supervisors that Bufford was not fit for management and action should be taken.  The court finds that plaintiff has not overcome Boeing's legitimate, nondiscriminatory reasons for demotion.

Under these circumstances, the court finds no direct evidence of race discrimination. Boeing provided a legitimate, nondiscriminatory reason for demoting Bufford, which plaintiff

14

fails to overcome.  There is no remaining question of fact for the jury.

IT IS ACCORDINGLY ORDERED this 5th day of April 2006, that the court grants defendant's Motion for Summary Judgment (Dkt. No. 48).


s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE